**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

DISABILITY RIGHTS FLORIDA, INC.,
on Behalf of its Clients and Constituents,

       Plaintiff,

vs.                                                  Case No.

MICHAEL D. CREWS,
Secretary, Florida Department of Corrections,
in his Official Capacity;
WEXFORD HEALTH SOURCES, INC.; and
FLORIDA DEPARTMENT OF CORRECTIONS,
an Agency of the State of Florida,

       Defendants.
_____/

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Introduction

       This action for injunctive and declaratory relief is brought by Disability Rights Florida,

an organization empowered and charged by Federal law to protect the rights of mentally ill

individuals in Florida, including persons with mental illness confined by the State of Florida at

Dade Correctional Institution (Dade CI).  Disability Rights Florida has standing to bring this

action on behalf of its numerous clients and constituents confined in the inpatient mental health

unit at Dade CI who are or may be affected by Defendants' unlawful actions and inactions at

Dade CI.  The Defendants, by their actions or inactions, have permitted people with mental

illness who were and currently are housed in the inpatient mental health unit at Dade CI to be

subjected to abuse and discrimination by correctional officers to such an extent that at least two

persons with mental illness have died within the last two years and numerous others have been harmed.

## Jurisdiction

1.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States, as well as being brought pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132 and the Federal Rehabilitation Act, 20 U.S.C. § 794.

2.      This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.  Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202.

3.      The venue lies in this district pursuant to 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to this claim occurred in this district.

## Parties

4.      Disability Rights Florida is the Protection and Advocacy System ("P&A") mandated under federal law to "ensure that rights of individuals with mental illness are protected."   42 U.S.C. § 10801(b)(1).  A P&A is tasked under law to protect and advocate for the rights of such individuals to ensure the enforcement of the Constitution and Federal and State statutes.  *Id.* at (b)(2)(A).  Among other things, Florida's P&A has the authority to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State."  42 U.S.C. § 10805(a)(1)(B); *see also Doe v. Stincer*, 175 F.3d 879 (11th Cir. 1999).

5.      Defendant, Michael D. Crews, is the Secretary of the Florida Department of Corrections (FDOC).  Defendant Crews is sued in his official capacity for the purpose of obtaining injunctive

relief.  Defendant Crews has the statutory authority to implement the relief sought in this Complaint.  *See* § 20.0553(b), Fla. Stat. (2014).

6.      Defendant Wexford Health Sources, Inc. (Wexford) is a private corporation under contract since December 2012 with the FDOC to provide care, including mental health care, to inmates housed at some of the state prisons in South Florida including Dade CI.  Wexford's contract with FDOC requires the provision of inpatient mental health care services to inmates housed in the inpatient mental health unit at Dade CI.

7.      Defendant FDOC is an agency of the State of Florida and administers and operates the Florida prison system, including Dade CI.  Defendant FDOC receives federal financial assistance and is covered by the Rehabilitation Act.  Defendant FDOC is a public entity within the meaning of Title II of the ADA.

## Factual Allegations

### Disability Rights Florida

8.      The Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801, *et seq.,* provides for the establishment and funding of systems within each state which are designed to protect and advocate the rights of individuals with mental illness, as well as to investigate incidents of abuse and neglect of those with mental illness.

9.      Federal funding is to be given to independent agencies or organizations which have the capacity to protect and advocate the rights of individuals with mental illness.  42 U.S.C. §§ 10804, 10805.

10.     The system established by each State to protect and advocate the rights of mentally ill individuals must have the authority to "pursue administrative, legal, and other appropriate

remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State." 42 U.S.C. § 10805(a)(1)(B).

11.     Pursuant to Florida law, Disability Rights Florida has been designated as the P&A under both the Protection and Advocacy for Individuals with Mental Illness Act and the Developmental Disabilities Assistance and Bill of Rights Act.

12.     As part of the authority and responsibility under the Protection and Advocacy for Individuals with Mental Illness Act, Disability Rights Florida has established an advisory council.  That advisory council provides advice on policies and priorities with regards to individuals with mental illness.  42 U.S.C. § 10805(a)(6)(A).

13.     Disability Rights Florida also provides the public with the opportunity to comment on its priorities with an annual survey.  42 U.S.C. § 10805(a)(8).

14.     Disability Rights Florida has established a grievance procedure for clients and prospective clients to assure that people with mental illness receive full access to protection and advocacy services.  42 U.S.C. § 10805(a)(9).

15.     One of the primary legal responsibilities of the P&A is to investigate allegations of abuse and neglect involving individuals with mental illness and to advocate for appropriate treatment and programs for such individuals.  The legal role of the P&A is to ensure that the legal and civil rights of individuals with mental illness are protected; that the individuals are treated with dignity and respect; and that the individuals receive appropriate services to address their needs.

16.     Disability Rights Florida brings this action on behalf of inmates within the FDOC who are currently clients and constituents of the P&A and who are mentally ill and confined in the inpatient mental health unit at Dade CI or who may be transferred to the inpatient mental health unit at Dade CI.

4

17.     The inmates confined within the FDOC at Dade CI, all of whom are clients and constituents of Disability Rights Florida in this action, are confined to "facilities" rendering care and treatment for the mentally ill as that term is defined in 42 U.S.C. § 10802(3).

## Facts Concerning Dade CI Inpatient Mental Health Units

18.     The FDOC by rule purports to provide for multiple levels of care for inmates with mental illness ranging from inpatient hospital beds to outpatient services.  The FDOC has designated Dade CI as one of the facilities providing inpatient mental health services.

19.     Dade CI has approximately 20 Crisis Stabilization Unit (CSU) beds and 176 Transitional Care Unit (TCU) beds. The inpatient unit at Dade CI is part of the FDOC's statewide mental health system and inmates in need of inpatient level of care may be transferred from any institution.

20.     The CSU level of care is supposed to provide intensive psychiatric and psychological care in a highly structured setting.  This level of care is designated for inmates with significant impairments due to serious mental illness who require intensive psychiatric and psychological services in a highly structured inpatient setting.

21.     The TCU level of care is supposed to provide psychiatric and psychological treatment in a structured residential setting.  This level of care is designated for inmates with significant impairments due to serious mental illness.  These patients' needs are not so severe as to require CSU level of care, but they still cannot function in a general population setting.

22.     The CSU and TCU make up the inpatient unit at Dade CI.  Most inmates in the Dade CI inpatient unit are housed in solitary confinement conditions.

23.     The doors to the cells in the Dade CI inpatient units are solid with a small window. There is also a small port that is locked from the outside except when it is opened to slide in meals or for the inmate to extend his wrists to be handcuffed before he leaves the cell.

24.     Dade CI inpatient inmates eat all of their meals in their cells.

25.     Inmates in the Dade CI inpatient unit are locked in their cells at all times unless they are attending a specific activity such as recreation yard, a therapy session or going to the showers. Officers use physical restraints on many inpatient inmates when they are removed from their cell and the inmates are always escorted by staff.

26.     The Dade CI inpatient unit treatment staff consisting of a psychiatrist, a psychologist, mental health specialists and nursing staff, are all employed by Wexford.

27.     Uniformed FDOC correctional staff run the security operation of the inpatient unit and control all movement of inmates and staff.

**Facts Regarding Abuse and Discrimination Against Inmates with Mental Illness**

28.     From at least 2011 to the present date, inmates with serious mental illness in the Dade CI inpatient mental health unit have been subjected to abuse and discrimination on a systematic and regular basis by correctional officers assigned to supervise the inpatient unit.  This abuse and discrimination continues today.

29.     Correctional officers working in the Dade CI inpatient mental health unit have subjected inmates to torture and abuse including a practice known as the "shower treatment" in which severely mentally ill inmates are locked in a scalding hot shower for hours at a time as retaliation.  Other forms of abuse were and are still common on the Dade CI inpatient unit including subjecting inmates to physical beatings, depriving them of food, and harassing them verbally and physically.

6

30.     Dade CI correctional officials, including supervisors on the inpatient unit and the prison warden, have had actual knowledge of the abuse of inmates on the inpatient mental health unit by correctional officers but have failed to take any steps to stop the abuse.

31.     The warden of Dade CI had, and continues to have, the authority within the FDOC to stop the abuse of inmates on the inpatient mental health unit by correctional officers but has failed to do so.

32.     Defendant Crews knew of the abuse at the Dade CI inpatient unit because former treatment staff and inmates repeatedly complained verbally and in writing to prison officials at Dade CI and to the FDOC Inspector General's office regarding the abuse.

33.     The Inspector General for the FDOC is appointed by and reports to the Secretary of the FDOC, Defendant Crews. *See* § 20.055(3)(b), Fla. Stat. (2014). The Inspector General is under the supervision of the Defendant Crews and is not subject to supervision by any other employee of FDOC. *Id.*

34.     The circumstances surrounding the deaths of at least two inmates on the Dade CI inpatient unit put Defendant Crews on notice of the ongoing abuse on the unit.

35.     In spite of this knowledge, for over two years Defendant Crews took no action to require any investigation to stop the continuing abuse on the Dade CI inpatient unit.

36.     The Dade CI inpatient unit treatment staff employed by Wexford had knowledge of the abuse of inmates by correctional officers in the Dade CI inpatient unit.

37.     Wexford treatment staff working the inpatient unit had actual knowledge that correctional officers were using the "shower treatment" as retaliation for the behaviors of mentally ill inmates on the Dade CI inpatient unit.

38.     Some of the treatment staff working the Dade CI inpatient unit reported the abuse to Wexford supervisory staff.  Wexford supervisory staff did nothing to report the allegations of abuse or investigate the allegations of abuse.  Wexford supervisory staff told treatment staff not to do anything regarding the allegations of abuse.

39.     In spite of the actual knowledge of the abuse, Wexford supervisory staff at Dade CI made no attempt to report or stop the abuse by the Dade CI inpatient unit correctional officers.

40.     Wexford had and continues to have a custom, policy, and practice of failing to intervene or failing to report instances of abuse by correctional officers on inmates in the Dade CI inpatient mental health unit.

**Specific Allegations Regarding Abuse**

41.     In 2011, a psychological counselor at Dade CI reported several instances of physical abuse by correctional officers on inmates in the Dade CI inpatient unit to prison officials at Dade CI, including the warden. The counselor indicated that the abuse included officers kicking and beating an inmate while he was restrained.

42.     The counselor reported that abuse of inmates on the Dade CI inpatient unit by correctional officers occurred on a regular basis.

43.     The counselor filed a variety of complaints with the Dade CI prison officials and the FDOC Inspector General office about the abusive treatment but never received a response.

44.     The counselor's employment at Dade CI was subsequently terminated.  No action was taken by prison officials on the counselor's reports of abuse.

45.     In June 2012, Darren Rainey, an inmate with a long history of serious mental illness, was housed in the inpatient unit at Dade CI for the purpose of treatment for his mental illness.

46.     In mid- to late June 2012, Mr. Rainey's mental status began to seriously deteriorate while he was housed in the Dade CI TCU.  He became increasingly agitated and delusional.

47.     Mr. Rainey's behaviors were a direct result of his mental illness.  His actions often angered the correctional officers and made him a target of abuse by the officers working on the Dade CI inpatient unit.

48.     On the evening on June 23, 2012, correctional officers on the inpatient unit removed Mr. Rainey from his cell, placed Mr. Rainey in physical restraints and escorted him to a locked shower stall located on the second floor of the inpatient unit.  The purpose of moving Mr. Rainey to the shower was to subject him to the "shower treatment."

49.     The officers turned the water temperature to scalding hot levels and left Mr. Rainey in the shower.  He was left in the shower for about one-and-a-half hours.

50.     When the officers returned to check on Mr. Rainey, he was found lying in the shower with burns over 90% of his body.  Although outside medical assistance was summoned, Mr. Rainey died at the prison.

51.     In June of 2012, a few days after Rainey's death, an inmate housed on the Dade CI inpatient unit filed a grievance with the Dade CI administration reporting that Mr. Rainey had been killed by correctional officers.  The inmate reported that the same officers that killed Mr. Rainey had also threatened him.  The inmate's information was referred to the FDOC Inspector General's office.

52.     Someone from the FDOC interviewed the inmate but neither Crews nor any other FDOC official took other action on the allegations.

53.     Neither Crews nor any other FDOC official interviewed any inpatient treatment staff or correctional officers working on the Dade CI inpatient unit regarding Mr. Rainey's death.  They

also did not investigate allegations of abuse by correctional officers on other inmates in the Dade CI inpatient unit.

54.     In October 2012, the FDOC Inspector General's office closed the investigation into Mr. Rainey's death and took no further action on the matter.  Not one Dade CI employee was suspended or disciplined as a result of the allegations of abuse against Mr. Rainey or other inmates.

55.     Mr. Rainey was not the only Dade CI inpatient mental health unit inmate to be subjected to the torture of the "shower treatment."  Numerous other inmates, all with serious mental illnesses, were placed in the shower as retaliation for behaviors that correctional officers did not like even though the behaviors were the direct result of the inmate's mental illness.

56.     Again, in February 2013, at least two inmates on the Dade CI inpatient unit filed grievances regarding the abuse by correctional officers of inmates on the inpatient unit.  One of the grievances stated that correctional officers routinely used the hot shower "as punishment on the most severely mentally ill inmates" on the Dade CI inpatient unit.  The grievance named three of the inmates subjected to the shower treatment.  The FDOC response to the grievances merely stated that the allegations had been referred to the Inspector General's office.

57.      For more than a year, Crews and FDOC officials failed to follow up on the Dade CI inpatient unit abuse allegations and never interviewed any of the inmates referenced in the grievances.

58.     One of the inmates named in the February 2013 grievance was inmate D.G[1].

---

[1] The people identified by their initials in this pleading are inmates with mental illness housed in an FDOC inpatient mental health unit.  Their initials are used to protect their confidentiality. Plaintiffs will disclose the identities of these inmates outside of public pleadings and pursuant to a confidentiality agreement with Defendants.

59.     Inmate D.G. was housed in an inpatient mental health unit at Dade CI from August 2011 to September 2012.

60.     D.G. is an inmate with a serious mental illness and a diagnosis of schizophrenia.

61.     As a result of his mental illness, D.G. is often unable to communicate to correctional officers or staff in a coherent fashion.  As a result of his mental illness, D.G. would often yell incoherently and bang or kick on his cell door in the Dade CI inpatient unit.

62.     In 2012, correctional officers at Dade CI repeatedly subjected inmate D.G. to the "shower treatment" as retaliation for behaviors resulting from his mental illness.

63.     Correctional officers would often abuse D.G. in additional ways, including denying him food, throwing him to the floor, yanking his arms with his handcuffs and various forms of verbal taunting and abuse.

64.     As a result of the abuse, D.G. suffered significant weight loss and a significant exacerbation of his mental illness.

65.     Supervisory correctional officers, including sergeants and lieutenants assigned to the Dade CI inpatient unit, were aware of abuse of D.G. but failed to stop it or report it.

66.     Wexford treatment staff working the Dade CI inpatient unit had actual knowledge of the abuse by correctional officers on D.G. and failed to take any steps to intervene or stop the abuse.

67.     Inmate M.A. is housed in the inpatient unit at Dade C.I.  M.A. has been housed in the inpatient unit at Dade C.I. since January 2011.

68.     M.A. is an inmate with serious mental illness and a diagnosis of schizophrenia.

69.     As a result of his mental illness, M.A. has difficulty communicating with correctional officers or staff in a coherent manner.  As a result, M.A. would often yell, sing, or respond to delusions in his cell.

11

70.     As a result of exhibiting these behaviors caused by his mental illness, correctional officers would subject M.A. to the "shower treatment" as well as other forms of physical and verbal abuse.

71.     As a result of the abuse, M.A. suffered a significant exacerbation of his mental illness.

72.     Supervisory correctional officers, including sergeants and lieutenants assigned to the Dade CI inpatient unit, were aware of abuse of M.A. but failed to stop it or report it.

73.     Wexford treatment staff working in the Dade CI inpatient unit had actual knowledge of the abuse by correctional officers on M.A. and failed to take any steps to intervene or stop the abuse.

74.     In September of 2013, inmate Richard Mair was housed in an inpatient mental health unit at Dade CI.  He was housed on the unit from January 2013 until his suicide on the Dade CI inpatient unit in September 2013.

75.     Mr. Mair was an inmate with a serious mental illness.  He had the diagnosis of major depressive disorder.

76.     Mr. Mair had multiple suicide attempts including one in late 2012 in which he ingested batteries and razor blades.

77.     Prior to his death, Mr. Mair repeatedly complained of physical and mental abuse by correctional staff against him and other inmates on the Dade CI inpatient unit.  No investigation was done by Dade CI administration or the FDOC Inspector General's office regarding his allegations.

78.     On or about September 11, 2013, Mr. Mair committed suicide in his Dade CI inpatient mental health unit cell.  Mr. Mair left a note in his cell indicating that his suicide was caused, at least in part, by continuing abuse by correctional staff on the unit.

79.     Supervisory correctional officers, including sergeants and lieutenants assigned to the Dade CI inpatient unit, were aware of the abuse of Mr. Mair and failed to make any effort to stop it or report it.

80.     The FDOC Inspector General's office reviewed Mr. Mair's death.  Neither Crews nor FDOC officials did anything in response to the allegations of ongoing abuse of inmates on the inpatient unit contained in Mr. Mair's suicide note.

81.     Wexford treatment staff working the Dade CI inpatient unit had actual knowledge of the abuse by correctional officers on inmate Mr. Mair and failed to take any steps to intervene or stop the abuse.

82.     When inmates report abuse to Wexford's treatment staff at Dade CI, the staff refuse to intervene or report the abuse.  For example, inmate D.M., an inmate housed on the Dade CI inpatient unit in 2012 and 2013, reported the ongoing abuse by correctional officers to treatment staff during a therapy session.  The staff member told D.M. that he could not help the inmates because the actions by the correctional officers were a "security issue."

83.     Neither Crews nor any FDOC officials made any effort to investigate Mr. Rainey's death or the other allegations of abuse on inmates on the Dade CI inpatient unit until June of 2014. The investigation only occurred as a response to a series of highly critical articles in the Miami Herald detailing Mr. Rainey's death and the allegations of abuse on the Dade CI inpatient unit.

84.     The articles include, among other things, statements attributed to current and former Dade CI employees and treatment staff confirming that the abuse of mentally ill inmates on the inpatient unit was widespread and systematic.

85.     The FDOC Inspector General's office has reopened its review of Mr. Rainey's death but only on the issue of whether the shower in which he was placed was functioning properly.

Defendant Crews has still not directed an investigation into the systematic and widespread abuse of inmates with mental illness by correctional officers at the Dade CI inpatient unit.

86.     No correctional officers involved in the death of Mr. Rainey or the abuse of other inmates on the Dade CI inpatient unit have been suspended or disciplined by Defendant Crews for their involvement in Mr. Rainey's death or abuse on the Dade CI inpatient unit.  Several of the correctional officers involved in the abuse are still employed by the FDOC and some have been promoted over the last two years since Mr. Rainey's death.

87.     Defendant Crews, through his Inspector General and other high ranking FDOC officials including the current Deputy Secretary of the FDOC, knew about the "shower treatment" and the widespread abuse of inmates with mental illness at the Dade CI inpatient unit starting with reports in 2011 and 2012.

88.     The failure of Defendant Crews and the FDOC to adequately investigate the allegations of abuse and to discipline and supervise the correctional staff at the Dade CI inpatient unit has directly resulted in a pattern and practice of systematic abuse of inmates on the inpatient unit by correctional officers.  The failure of Defendant Crews and the FDOC to investigate and stop the abuse has caused, and continues to cause, inmates physical and mental harm, exacerbation of their mental health symptoms, and death.

89.     The failure of Defendant Crews and the FDOC to investigate and stop the abuse on the Dade CI inpatient unit is particularly egregious because the allegations involved inmates with serious mental illness housed on an inpatient treatment unit.  Defendant Crews, through his Inspector General, knew that many of these inmates, such as D.G. and M.A., are particularly vulnerable to abuse because the severity of their mental illness renders them unable to complain or report abuse upon them.

14

90.     The abuse of inmates with mental illness on the inpatient unit at Dade CI has caused ongoing and severe harm to the inmates confined there and there is a substantial risk of future harm to the inmates.

91.     Defendant Crews was aware of the risk of harm caused by the abuse of the inmates confined to the inpatient unit and failed to take reasonable measures to address it.

92.     The verbal and physical abuse of the inmates on the Dade CI inpatient unit was based on the inmates' disabilities.

93.     The verbal and physical abuse of inmates on the Dade CI inpatient unit was severe and pervasive.  The abuse has exacerbated the inmates' mental illness and adversely affected the inmates' participation in treatment on the inpatient unit.

94.     The Defendants had actual knowledge of the abuse and harassment of inmates with mental illness on the unit and failed to take prompt action to stop it.

95.     At all times the Defendants have acted under color of state law.

96.     By failing to stop the abuse of inmates with mental illness housed on the Dade CI inpatient unit, Defendant Crews excluded those inmates from participation in or denied them the benefits of the FDOC's treatment program or activities, or otherwise discriminated against them.

97.     Plaintiff has no adequate remedy at law.

**Count One**
**(42 U.S.C. § 1983 against Defendants Crews for**
**Violations of the Eighth Amendment)**

98.     Plaintiff repeats and realleges paragraphs 1 through 97 as if fully set forth herein.

99.     The Eighth Amendment protects prison inmates from excessive uses of force by prison officials.  The Eighth Amendment also imposes duties on prison officials to provide humane

conditions of confinement; to ensure that inmates receive adequate food, clothing, shelter, and medical care; and to take reasonable measures to guarantee the safety of the inmates.

100.    The physical abuse and brutality by FDOC correctional officers against inmates with mental illness housed on the inpatient unit at Dade CI was so excessive and unnecessary as to constitute a violation of the Eighth Amendment of the United States Constitution.

101.    The physical abuse and brutality by FDOC correctional officers against inmates with mental illness housed on the inpatient unit at Dade CI was imposed maliciously and sadistically for the very purpose of causing harm and was unrelated to any good faith effort to maintain or restore discipline.

102.    The physical abuse and brutality by FDOC correctional officers against inmates with mental illness housed on the inpatient unit at Dade CI caused death and serious harm to the inmates housed on the unit.  It continues to pose a substantial risk of harm to the inmates that are now or may in the future be housed on the inpatient unit.

103.    Defendant Crews had actual knowledge of the abuse of inmates on the Dade CI inpatient mental health unit and knew that the abuse posed a pervasive risk of harm to those inmates. Defendant Crews' response to the risk was so inadequate and unreasonable that it constitutes deliberate indifference to the inmates' rights as guaranteed by the Eighth Amendment to United States Constitution.

104.    Defendant Crews' actions and inactions have caused continuing violations of the Eighth Amendment rights of Disability Rights Florida's clients and constituents housed at Dade CI.

**Count Two**
**(42 U.S.C. § 1983 against Defendant Wexford for**
**Violations of the Eighth Amendment)**

105.    Plaintiff repeats and realleges paragraphs 1 through 97 as if fully set forth herein.

106.     The Eighth Amendment protects prison inmates from excessive uses of force by prison officials.  The Eighth Amendment also imposes duties on prison officials to provide humane conditions of confinement; to ensure that inmates receive adequate food, clothing, shelter, and medical care; and to take reasonable measures to guarantee the safety of the inmates.

107.     The physical abuse and brutality by FDOC correctional officers against inmates with mental illness housed on the inpatient unit at Dade CI was so excessive and unnecessary as to constitute a violation of the Eighth Amendment of the United States Constitution.

108.     The physical abuse and brutality by FDOC correctional officers against inmates with mental illness housed on the inpatient unit at Dade CI was imposed maliciously and sadistically for the very purpose of causing harm and was unrelated to any good faith effort to maintain or restore discipline.

109.     The physical abuse and brutality by FDOC correctional officers against inmates with mental illness housed on the inpatient unit at Dade CI caused death and serious harm to the inmates housed on the unit.  It continues to pose a substantial risk of harm to the inmates that are now or may in the future be housed on the inpatient unit.

110.     Defendant Wexford has had knowledge of the abuse of inmates on the Dade CI inpatient mental health unit and knew that the abuse posed a pervasive risk of harm to those inmates but Wexford employees have failed to report the abuse or to otherwise intervene to halt the abuse.

111.     The actions and inactions of Wexford's employees were the result of Wexford's custom, policy or practice of failing to report or intervene in instances of abuse by correctional officers on inmates in the Dade CI inpatient mental health unit.

112.     Defendant Wexford's custom, policy or practice of failing to report or intervene in instances of abuse by correctional officers on inmates in the Dade CI inpatient mental health unit constitutes reckless disregard of a substantial risk of serious harm to those inmates.

113.     Defendant Wexford's custom, policy or practice has resulted in the continuing abuse to inmates housed in the Dade CI inpatient mental health unit in violation of their rights as guaranteed by Eighth Amendment to the United States Constitution.

114.     Defendant Wexford's actions and inactions have caused continuing violations of the Eighth Amendment rights of Disability Rights Florida's clients and constituents housed at Dade CI.

### Count Three
### (ADA and Rehabilitation Act Claims Against Defendant FDOC)

115.     Plaintiff repeats and realleges paragraphs 1 through 97 as if fully set forth herein.

116.     The Federal Rehabilitation Act prohibits discrimination against an individual based on disability by any program or entity receiving federal funds. 29 U.S.C. 794(a) and (b)(2)(B).

117.     Title II of the Americans with Disabilities Act prohibits disability-based discrimination by any public entity. 42 U.S.C. §§ 12131-12132.

118.     These disability anti-discrimination laws impose an affirmative duty on public entities to create policies or procedures to prevent discrimination based on disability.

119.     The inmates housed on the Dade CI inpatient unit are persons with disabilities as defined in the Rehabilitation Act and Title II of the ADA.

120.     Defendant FDOC is a program or entity which receives federal financial assistance.

121.     Defendant FDOC is a public entity as defined by Title II of the ADA.

122.     Defendant FDOC's inpatient mental health unit is a facility and its operation comprises a program and services for purposes of the Rehabilitation Act and Title II of the ADA.

18

123.    The inmates housed on the Dade CI inpatient unit are qualified to participate in or receive the benefit of FDOC's services, programs, or activities.

124.    The inmates housed on the Dade CI inpatient unit were abused because of their disabilities by FDOC's agents and employees at Dade CI.   Such abuse constitutes discrimination against individuals based on their disability in violation of the Rehabilitation Act and Title II of the ADA.

125.    The abuse of inmates housed on the Dade CI inpatient unit by FDOC's agents and employees denied those inmates the benefits of the services, programs, or activities of FDOC's inpatient unit in violation of the Rehabilitation Act and Title II of the ADA.

126.    The abuse of inmates housed on the Dade CI inpatient unit was carried out by Defendant FDOC's agents and employees at Dade CI while acting within the scope of their employment by FDOC.  Defendant FDOC is liable for the actions of its agents and employees when they committed the violations of the Rehabilitation Act and Title II of the ADA alleged herein.

127.    FDOC has discriminated against Disability Rights Florida's clients and constituents housed at Dade CI, by failing to provide a non-abusive, safe treatment environment on the inpatient unit that will allow inmates with mental illness to participate in the treatment program at Dade CI.

**Request for Relief**

Therefore, Disability Rights Florida, on behalf of the mentally ill inmates who are currently confined at the inpatient mental health unit at Dade CI, request that this Court:

A.    Accept jurisdiction of this case and set it for hearing at the earliest opportunity;

B.    Declare that the actions and inactions of the Defendants are unlawful and unconstitutional for the reasons as specified above;

19

C.      Enter an injunction enjoining the Defendants from continuing to violate the constitutional and statutory rights of the mentally ill inmates confined at the Dade CI inpatient unit as well as those inmates who may, at some point in the future, be transferred to the inpatient unit at Dade CI.  Specifically, Plaintiff seeks an injunction requiring Defendant Crews to take immediate action to investigate and stop the ongoing abuse of inmates with mental illness at Dade CI; requiring Crews to immediately take steps to train and supervise the officers assigned to the inpatient unit to ensure that the abuse does not recur; requiring periodic independent oversight of the Dade CI inpatient unit; and requiring Crews to take immediate steps to ensure the timely investigation of allegations of abuse upon inmates in the inpatient mental health unit. Plaintiff also seeks an injunction requiring Defendant Wexford to change its custom, policy or practice at Dade CI so as to require its employees at Dade CI to immediately report allegations of abuse.   Plaintiff seeks an injunction requiring Defendant Florida Department of Corrections to stop discriminating against the inmates on the Dade CI inpatient unit on the basis of disability.

D.      Retain jurisdiction over this matter to ensure that the terms of any injunction are fully implemented.

E.      Award Plaintiffs its costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794.

F.      Award all other necessary and appropriate relief that this Court may deem appropriate.

Respectfully Submitted,

/s/ Peter P. Sleasman
Peter P. Sleasman, Esq.
Fla. Bar No. 367931
Lead Counsel

Kristen Cooley Lentz, Esq.

20

Fla. Bar No. 649635

Florida Institutional Legal Services Project
Florida Legal Services
14260 W. Newberry Road, #412
Newberry, FL 32669
(352) 375-2494 (telephone)
(352) 331-5202 (facsimile)
peter@floridalegal.org
kristen@floridalegal.org

David Boyer, Esq.
Florida Bar No. 90917

Molly J. Paris, Esq.
Florida Bar No. 90486

Disability Rights Florida
1930 Harrison St Ste 104
Hollywood, Florida 33020
(850)488-9071 (telephone)
(850)488-8640 (facsimile)
davidb@DisabilityRightsFlorida.org
mollyp@DisabilityRightsFlorida.org

George E. Schulz, Jr., Esq.
Fla. Bar No. 169507

Holland & Knight LLP
50 North Laura Street, Suite 3900
Jacksonville, Florida 32202
(904) 353-2000
(904) 358-1872 (facsimile)
buddy.schulz@hklaw.com

Attorneys for Plaintiff