UNITED STATES DISTRCIT
COURT SOUTHERN
DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:14-cv-23323-RNS
Consolidated Case No. 1:14-cv-24140-RNS

ANDRE      CHAPMAN,      as
Personal Representative of the
ESTATE     OF     DARREN
RAINEY, on behalf of the
Estate, and on behalf of Darren
Rainey's Surviving Relatives,
Andre      Chapman,      Renee
Chapman, Deborah Johnson
Chnieaqua Breelove and Harold
Marr,

      Plaintiff,

vs.

FLORIDA      DEPARTMENT
OF CORRECTIONS, an Agency
of the State of Florida; CORIZON,
L.L.C., an out-of- state limited
liability corporation doing business
and registered in Florida;
ROLAND CLARKE;
CORNELIUS THOMPSON
 and JERRY CUMMINGS,

      Defendants.

_____/

**NOTICE OF FILING TRANSCRIPT OF HEARING**

Linda Commons, Esq. hereby files the Transcript of the Hearing held on

February 15, 2018 attached hereto.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on this 23rd day of February, 2018, a true and correct copy of the foregoing Transcript has been filed with the Court utilizing its CM/ECF system, which will transmit a notice of electronic filing to all counsel or parties of record registered with the Court for that purpose.

By: /s/ Linda Bellomio Commons, Esq.

Linda Bellomio Commons, R.N., J.D.
LAW OFFICE OF LINDA BELLOMIO COMMONS, P.A.
Florida Bar No:0778346
P.O. Box 340261 Tampa, FL 33694
Phone:(813) 679-3181
Phone:(352) 610-4416 Fax:(813) 265-3010
Email: lcommons@aol.com
Secondary:dmheiser1@gmail.com

```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION

 3
      ANDRE CHAPMAN, as Personal    )
 4    Representative of the Estate  )
      of DARREN RAINEY, on behalf   )
 5    of the Estate, and on behalf  )
      of Darren Rainey's Surviving  )
 6    Relatives, Andre Chapman,     )
      Deborah Johnson, Chineaqua    )        Case Number
 7    Breelove and Harold Marr,     )
                                    )        1:14-cv-23323-RNS
 8                                  )
             Plaintiff,             )
 9                                  )
                  v.                )
10                                  )
      FLORIDA DEPARTMENT OF         )
11    CORRECTIONS, et al.,          )
                                    )
12           Defendants.           )
      _____)

13

14

15                Transcript of a motion hearing

16          before the Honorable Robert N. Scola, Jr.

17               February 15, 2018; 9:31 a.m.

18                     Miami, Florida

19

20

21
          Proceedings recorded by mechanical stenography,
22    transcript produced by computer.
      _____

23
                    Diane Peede, RMR, CRR, CRC
24             Federal Official Court Reporter
              400 North Miami Avenue, Eighth Floor
25                 Miami, Florida  33128
```

1     **Appearances:**

2

      **Counsel for Plaintiff:  Milton C . Grimes**
3                               **Vicki I. Sarmiento (by phone)**

4

      **Counsel for Defendants**
5       **Roland Clarke and**
        **Cornelius Thompson:  Oscar Marrero**
6

7     **Counsel for Defendant**
        **Corizon, LLC:        Gregg A. Toomey**
8

9     **Counsel for Defendant**
        **FDOC:                Monica Stinson**
10

11    **Counsel for Defendant**
        **Jerry Cummings:      Sheridan Weissenborn**
12

13    **Counsel for Linda**
       **Commons:             Max R. Price, Jr.**
14

15    **Counsel for Milton**
        **Grimes:             John R. Sutton**
16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2            THE COURT:  Okay.  So the next matter is Andre

 3    Chapman, as Personal Representative of the Estate of Darren

 4    Rainey, et al, versus the Florida Department of Corrections,

 5    et al.

 6            So who's here physically present in court, first?

 7            MR. SUTTON:  Your Honor, good morning.  Judge

 8    Scola, John R. Sutton.  I've been retained to represent Mr.

 9    Milton Grimes, who is the plaintiff's attorney.  And this is

10    an equitable lienorship.

11            THE COURT:  Good morning.

12            MR. MARRERO:  Your Honor, Oscar Marrero on behalf

13    of Roland Clarke and Mr. Thompson, who are defendants.

14            THE COURT:  All right.  Good morning.

15            MS. STINSON:  Good morning, Your Honor.  Monica

16    Stinson of the Florida Office of Attorney General on behalf

17    of the Florida Department of Corrections.

18            THE COURT:  All right.  Good morning.

19            MS. WEISSENBORN:  Good morning, Your Honor.  Sheri

20    Weissenborn on behalf of Warden Jerry Cummings.

21            MR. TOOMEY:  Good morning, Judge.  Gregg Toomey for

22    Corizon.

23            THE COURT:  Good morning.

24            MR. PRICE:  Good morning, Your Honor.  I'm Max

25    Price.  I'm here on behalf of Linda Commons.
```

4

```
 1              THE COURT:  All right.  Where is Ms. Commons?

 2              MR. PRICE:  She should be here momentarily, Your

 3  Honor.

 4              We're ready to proceed.

 5              MS. SARMIENTO:  Good morning, Your Honor.  Vicki

 6  Sarmiento for the plaintiffs, on call.

 7              MR. GRIMES:  Good morning, Your Honor.  Milton

 8  Grimes for the plaintiffs.

 9              THE COURT:  All right.  Good morning.

10              How far away is Ms. Commons?

11              MR. PRICE:  She was right behind us, Your Honor.

12  So I expect her here any minute.

13              THE COURT:  Okay.

14              Who is the court reporter in the back?  We have a

15  court reporter here.  So we don't need a second court

16  reporter.

17              So I don't know who ordered a court reporter, but

18  don't take -- I'm ordering you not to take it down.  We have

19  an official court reporter here.  So this is a court of

20  record.

21              (A pause in the courtroom.)

22              THE COURT:  Ms. Commons.

23              MS. COMMONS:  I apologize.

24              THE COURT:  So we're here on the plaintiff's motion

25  to strike charging lien of Linda Commons, or alternatively,
```

5

 1    to approve settlement agreement and adjudicate the charging

 2    lien.

 3            So let me first say I have no intention of making a

 4    ruling today about whether Ms. Commons is or is not entitled

 5    to any attorney's fees or how much she's entitled to.  My

 6    only concern is whether she's entitled to have a charging

 7    lien that interferes with the ability of the settlement to go

 8    forward while she resolves any dispute she has with Mr.

 9    Grimes.

10            So this is the plaintiff's motion to strike

11    charging lien.  So let me hear from you first since this is

12    your motion.

13            MR. SUTTON:  May I speak, Your Honor?

14            THE COURT:  Yes.

15            MR. SUTTON:  John R. Sutton representing Mr.

16    Grimes.

17            THE COURT:  Yes.

18            MR. SUTTON:  This was a settlement which has been,

19    as it were, consummated for $4.5 million.  There's a claim of

20    a charging lien, which we understand is not something for you

21    to rule on today.  Fine.

22            The only person prejudiced by the outstanding

23    demand by Ms. Commons that the check bear both names is the

24    client.  The client should not be prejudiced here.

25            It is our then-request as follows:  That either

 1    there be an agreement or that an order that the check not

 2    include Ms. Commons' name.

 3            That does not mean that her claim, which we feel is

 4    invalid for a charging lien, or her claim, which we feel is

 5    invalid, for quantum meruit is to evaporate and go away and

 6    not be considered.

 7            The proposition is that the amount that's

 8    claimed -- I think it's ten percent of the attorney's fee --

 9    could be secured and protected during the time period of the

10    resolution of this.  In other words, the check should be

11    payable to one party, that being Mr. Grimes and/or his client

12    and/or trust account.

13            THE COURT:  And he's willing to put ten percent of

14    the attorney's fees in trust pending the resolution of her

15    claim?

16            MR. SUTTON:  Yes, Your Honor.

17            THE COURT:  Does that satisfy your concerns?

18            MR. PRICE:  Actually, it does in part, Your Honor,

19    certainly as it pertains to Ms. Commons.  But, of course, as

20    I've reviewed the file and what's taken place, I think it's

21    beholding upon this Court and its obligation to the

22    plaintiffs receiving the funds that the totality of the

23    attorney's fees be put into trust.

24            Certainly we don't dispute that the money's going

25    to the plaintiffs.  We don't want to hold that back.  That

1    can certainly be disbursed.  But I would say until further

2    consideration of all of the attorney's fees and the validity

3    of contracts that exist in this case, I think all of the

4    attorney's fees have to be held in trust, because this Court

5    may eventually find that a large majority of those fees will

6    have to be turned over to the plaintiffs.

7              THE COURT:  Okay.  And based upon your argument

8    that there never was a valid contingency fee agreement

9    between Mr. Grimes and the plaintiffs?

10             MR. PRICE:  I have all of the contracts --

11             THE COURT:  The only reason that she would be able

12   to get fees is because she's, like, getting the benefit of

13   his -- she's like a conduit to get fees from the client

14   through Mr. Grimes.  If his contract is void, doesn't that

15   void her right to collect any fees?

16             MR. PRICE:  It certainly would under a contingency

17   basis, but if the Court were to so rule in that regard, then

18   the only claim that would be left as to attorney's fees would

19   be Attorney Commons by way of quantum meruit.

20             By way of case law, if this Court finds that the

21   Grimes law firm never had a valid contract and a Florida

22   attorney of contract as well, then all of the fees or

23   remaining fees would be turned over to the plaintiffs as a

24   matter of law.

25             THE COURT:  Okay.  Who's here -- so Mr. Grimes

```
 1    represents Andrea Chapman as the personal representative of
 2    the Estate of Darren Rainey?
 3              MR. GRIMES:  Yes, Your Honor.
 4              THE COURT:  All right.  So let me hear your further
 5    argument, then, Mr. Sutton, since apparently there --
 6              MR. SUTTON:  Your Honor, as I understand it, the
 7    maximum amount that Ms. Commons is claiming is ten percent
 8    or, if not enforceable, quantum meruit.  That being the case,
 9    we do not understand any reason whatsoever why the entire
10    attorney's fee should be held in escrow and then only that
11    amount that she's claimed.
12              And, again, I just got into this last night or the
13    night before.  It's my understanding that their maximum claim
14    is ten percent or quantum meruit, whichever is less.
15    Therefore, with the attorney's fee, if my understanding is
16    correct, 1,200,000, there shouldn't be any reason to tie up
17    or escrow the difference between the amount of what we
18    believe is the invalid claim for ten percent, or 120,000, and
19    the balance which Mr. Grimes is entitled to.
20              Furthermore, I am not aware of any dispute over the
21    contractual amount.  I have reviewed the contract, the
22    client's statement of rights.  It is one of the most thorough
23    that I've ever seen, and it includes the Florida law
24    breakdown percentages, 40, 30, 20 and so on.
25              So we are asking the Court to allow the escrow of
```

```
 1   just the amount that's claimed so that the client doesn't
 2   suffer, and all other matters then can be resolved.
 3            THE COURT:  Okay.
 4            All right.  Let me hear your argument.
 5            MR. PRICE:  If I may, Your Honor, we filed along
 6   with Ms. Commons pleadings one of the contracts, and
 7   apparently there are multiple contracts signed by various
 8   interested parties who represent the totality of plaintiffs.
 9            All the contracts are identical.  And I've actually
10   brought the remainder of these contracts.  In every one of
11   these contracts, the only people that sign these contracts
12   were the plaintiffs and Mr. Grimes.
13            There's case law right on point that came out of
14   the Florida Supreme Court -- I cited it to the Court -- which
15   is Chandris versus Yanakakis.  The Florida Supreme Court
16   discussed this very issue, and this case is almost identical.
17   In that instance, the court found that -- it says that for a
18   non-Florida attorney, he must join with the Florida attorney
19   in a contract, a written contract that's signed by the
20   Florida attorney.
21            No such contract exists.  In fact, within our
22   pleadings, not only did we make it a part of the pleadings,
23   but Ms. Commons swore these were the contracts.  Mr. Grimes,
24   Ms. Sarmiento don't dispute that, that they don't have a
25   Florida attorney as a matter of law on their contracts.  And
```

1    as such, the Chandris case and the Florida Supreme Court says

2    that these contracts aren't voidable.  They're in fact void

3    ab initio.  And because they're void ab initio, as a matter

4    of law, these attorneys came into the state, and this Court

5    gave them an opportunity when it granted their pro hac vice

6    status to come in here and practice law in accordance with

7    Florida law.  They've never done that in this case.

8         They enter into an unlawful contract with all of

9    these plaintiffs.  They're still unlawful.  They only had a

10   Florida attorney who did the ministerial filing for them.

11   And, again, Florida's law says that's not enough.  In fact,

12   according to Florida Rules of Professional Conduct, the

13   Florida attorney must actively participate within the case.

14        In fact, there's a comment that goes along -- and

15   this is Rule 4.5-5.  And the comment that goes along with it

16   in subsection C(1) says this:  This recognizes the interest

17   of clients and the public to be protected.  If a Florida --

18   if a lawyer admitted only in another jurisdiction associates

19   with a lawyer licensed to practice in Florida.

20        When it says "associate," according to Chandris,

21   the Florida lawyer has to sign, and in that contract, it

22   specifically has to set forth the disbursement of fees

23   between the attorneys.

24        But it goes on to say that for these subdivisions

25   to apply, the lawyer admitted to practice in Florida could

not serve merely as a conduit for the out-of-state lawyer --
in other words, just to do the filings, such as the Florida
lawyer in this case -- but would have to share actual
responsibility for the representation and actively
participate in the representation.

In this instance, Mr. Grimes and Ms. Sarmiento have
filed their actual Declarations in which both of them have
actually told this Court that all of the work that was done
in this case was done by Mr. Grimes and Ms. Sarmiento, both
California lawyers not authorized to do business in the state
of Florida.

Yet they ignore the Florida Rules of Civil
Procedure.  They ignore the professional rules of conduct,
and they certainly ignore Chandris from day one with an
invalid contract, and they have been practicing for years
without a Florida lawyer, in violation of Florida law.

And that should come as great concern to this Court
for two reasons:  Number one, it represents a felony to
practice law in the state of Florida when you're
unauthorized; but the second part is it opens the door to
attorneys like Grimes and Sarmiento and whatever other
attorneys, from New York to Chicago, who want to come into
Florida, practice law and all they do to get around that is
they come to a judge like you and they say give us pro hac
vice status, you do so in good faith, and they just get a

 1    Florida lawyer and they pay him a few shekels, all they do is

 2    do their filings.

 3             THE COURT:  And when did your client learn about

 4    the existence of these contracts that were not signed by the

 5    other lawyer?

 6             MR. PRICE:  Quite frankly, Judge, it's when I got

 7    involved with this case in the last few days and I started to

 8    review it.

 9             And beyond my obligation to my client as a Florida

10    licensed attorney and an officer of this court, any time when

11    I see unlawful activity such as the unlawful activity I see

12    in this case, I am duty bound, way beyond my client, to come

13    to you as the judge to say, Judge, I'm disturbed by what's

14    happening here because it is a felony and it's the unlawful

15    practice of law in this state, and I think this Court needs

16    to take serious consideration and look at the totality of the

17    circumstances.

18             In the meantime, I certainly don't think Mr. Grimes

19    or Ms. Sarmiento should be allowed to cart their attorney's

20    fees back off to the state of California, wherever they come

21    from.  Those monies should be held in Florida.  And if his

22    attorney -- and I take it he's a Florida attorney.  Maybe

23    not.  But if their attorney is Florida licensed, I'll agree

24    to hold all the attorney's fees in trust by a Florida

25    licensed attorney until this Court can investigate what's

1  going on in this case.

2          THE COURT:  All right.

3          MR. SUTTON:  May it please the Court, I am a

4  Florida licensed attorney.

5          THE COURT:  I know that.

6          MR. SUTTON:  I thought you would know that.

7          MR. GRIMES:  Your Honor, may I address the Court?

8          THE COURT:  Yes.

9          MR. GRIMES:  Ms. Sarmiento has researched this

10 particular case that counsel is citing.  Could she speak on

11 this matter, please?

12          THE COURT:  Is there a contract that is signed by

13 the clients and the Florida lawyer that you employed?

14          MS. SARMIENTO:  Your Honor, can I address that

15 issue, if I'm allowed?  I'm on telephonic.  I'm not sure if

16 the Court can hear me.

17          THE COURT:  Yes.

18          MS. SARMIENTO:  Your Honor, I actually have

19 contacted the ethics line of the Florida State Bar.  If the

20 local counsel is not sharing in the contingency fee, there is

21 no requirement that she be put on the contingency fee

22 agreement.

23          In this case -- and the rule that is cited by Mr.

24 Price actually doesn't even hold that requirement.  He cites

25 Rule 4.1.5(f)(2).  That rule pertains to the attorneys that

1    are sharing in the contingency fee have to be spelled out in

2    the agreements and the proportion of their share.  In this

3    case, Ms. Newman is not sharing in the contingency fee

4    agreement.

5         And, also, Chandris is very factually different

6    than the case before the Court.  In Chandris, that involved a

7    Florida resident attorney who for some reason never undertook

8    to be admitted into the Florida Bar.  He was a Massachusetts

9    lawyer.  So, obviously, public policy would dictate that.

10        A client may unknowingly believe that the Florida

11   resident attorney is authorized to practice law in Florida.

12   That attorney in Chandris took several months to employ a

13   Florida associate with a Florida licensed attorney.  That is

14   not the case here.

15        The clients from the beginning, when they

16   substituted in Mr. Grimes, knew he was a California attorney.

17   They knew he would be associated with local counsel.  He

18   would obtain pro hac vice status, which he did immediately

19   upon being retained.

20        He is not practicing law in Florida unauthorized,

21   as the attorney in Chandris, who was a Florida resident.

22   And, actually, the client probably believed in Chandris that

23   being a Florida resident, that an attorney was licensed in

24   Florida.

25        So the facts are very different in this case.  The

1  only attorney who's sharing the contingency fee is Mr.

2  Grimes.  The client authorized that.  Ms. Newman is not

3  participating in the contingency fee.

4          And, furthermore, Your Honor, Ms. Newman has

5  participated since 2015 from the onset of this case.  She has

6  done legal research.  Even though this is going beyond the

7  bounds of our motion to strike, she attended the plaintiff's

8  deposition.  She participated in the preparation.  She's had

9  an ongoing relationship with Mr. Grimes' office and my

10 office.  Every legal filing that she's signed, she reads and

11 has input.

12         Again, I feel compelled to inform the Court of

13 these facts because of the issues raised by Mr. Price, which

14 are basically based on speculation by his client, which I

15 believe that he, as a licensed attorney, should not be making

16 these outlandish allegations based on speculation without

17 knowing the nature of the relationship between the clients,

18 between Mr. Grimes, myself and Ms. Newman.

19         THE COURT:  So somebody this morning gave me a

20 stipulation and petition for substitution of counsel dated

21 June 4, 2015, where Vernita C. Williams substituted for

22 Edward Corin of Holland and Knight as the attorney of record

23 for the Estate of Darren Lee Rainey.

24         So why did somebody give me that?  Who gave me that

25 and what is the significance of that to this proceeding?

1       MS. STINSON:  Your Honor, Monica Stinson, Attorney

2  General's Office for the Florida Department of Corrections.

3       I actually, to my embarrassment, walked out of the

4  house without my file.  So I had this faxed to me.  And while

5  the settlement is between the co-defendants, the mediation

6  agreement is that upon the payment, that the Florida

7  Department of Corrections will be dismissed from this action.

8       And the reason I brought that along with the order

9  designating the depository for the assets was just to notify

10 the Court that, of course, there was an estate opened and

11 there was an order entered June 6, 2014, regarding the

12 depository.  That's why I had it.

13      THE COURT:  But who is Vernita Williams?  She was

14 the predecessor attorney to Mr. Grimes?

15      MR. GRIMES:  She was a probate attorney, Your

16 Honor, hired in this matter.

17      THE COURT:  I see.  That was from the circuit

18 court, probate.  That's not this case?

19      MS. STINSON:  Yes, Your Honor.  Correct.

20      THE COURT:  And what does that have to do with this

21 case or this issue?

22      MR. SUTTON:  Your Honor, if I may help, under

23 Florida law, the party plaintiff is the personal

24 representative of the estate of the decedent.

25      THE COURT:  Right.

1          MR. SUTTON:  So that somewhat controls the

2     situation.

3          Furthermore, just to add --

4          THE COURT:  "That" meaning that Ms. Williams is

5     acting on behalf of the estate and she's the one who hired

6     Mr. Grimes?

7          MR. SUTTON:  I don't know all of the background,

8     but that is my understanding.  And this is relative or

9     relevant to the probate matter.  And therefore that being the

10    case, I believe, not checking Florida Bar numbers, but that

11    would be a Florida lawyer.

12          If I may just add, and others don't know this, I

13    have practiced law 45 years unsanctioned, without suspension

14    of my license.  I've been Board certified as a civil trial

15    lawyer since 1985.  And I am willing to hold in escrow,

16    pending order of Court or agreement of all interested

17    parties, the sum of $120,000.

18          THE COURT:  So, Mr. Grimes, tell me, who retained

19    you?  And I think their claim is that you're California

20    lawyers.  If you signed a contract first and said -- I guess

21    they're arguing if you sign a contract first and then later

22    get a Florida attorney, that the contract is void.

23          Is that your argument, Mr. Price?

24          MR. PRICE:  Yes.  And I can supply to the Court

25    this case of Chandris versus Yanakakis.  And, in fact, Judge,

1   it's almost identical in this situation, because in that

2   particular case, you had a situation where the Florida lawyer

3   that they went and hired was Ira Leesfield and his firm.   In

4   fact, the Court addressed that and basically it answered two

5   questions.

6          The first question that they asked in Chandris is

7   whether an out-of-state attorney who resides in Florida but

8   is not associated with a Florida firm basically is engaged in

9   the unauthorized practice of law when that attorney enters

10  into a contingent fee contract in Florida, thereby rendering

11  the fee agreement void.   The court said yes.

12         The second question:   Whether a fee agreement of a

13  Florida law firm borne out of that fee agreement is void as

14  the unauthorized practice of law itself void.   And, again,

15  the Florida Supreme Court said it was void.   And the

16  Leesfield firm walked away with nothing in this case.

17         I have extra copies.   I'm more than happy to supply

18  the Chandris case to you, because the fact situation in

19  Chandris is virtually identical to what's happened in this

20  particular instance.

21              THE COURT:   Okay.

22         So, Mr. Grimes, how -- what is the sequence of

23  events of your retention versus -- by the client versus

24  retaining a Florida lawyer?

25              MS. SARMIENTO:   Your Honor, if I could just quickly

 1   address the Chandris issue?

 2            THE COURT:  I would rather you address my question

 3   and then you can address the Chandris issue.

 4            MS. SARMIENTO:  Well, it's my understanding that

 5   when Mr. Grimes was contacted by Andre Chapman to substitute

 6   in, Mr. Grimes immediately contacted Ms. Newman.  However,

 7   Ms. Newman did not want to undertake the risk of taking this

 8   case on a contingency fee, and therefore the contingency fee

 9   agreement was just signed by Mr. Grimes and the client.

10            However, Mr. Price is not being genuine with the

11   facts in Chandris.  Chandris focused on the fact that the

12   attorney was a Florida resident and it took a few months

13   before he associated with a Florida licensed attorney.

14            Therefore, one of the pivotal questions, in fact,

15   specifically says whether an out-of-state attorney who

16   resides in Florida but is not associated with a Florida law

17   firm engages in the unauthorized practice of law.  That was a

18   key pivotal fact.

19            The fact that he was a resident in Florida, which

20   to an unknowing client may perhaps mislead them to believe

21   that they're authorized to practice law in Florida by virtue

22   of the residency, that is not the case here.  There was no

23   deception at all to the client.

24            There is no rule that says that if local counsel is

25   not sharing in the contingency fee agreement, that they have

1    to be a signature to that agreement.

2           I've contacted the ethics bar -- I'm sorry -- the

3    Florida Bar seeking to see whether that rule exists.  I've

4    been told it doesn't.

5           I've read the Florida Bar rules regarding

6    contingency fees.  That does not exist, Your Honor.  That

7    rule does not exist.

8           Chandris is not similar at all to the facts of this

9    case.

10          MR. GRIMES:  For the Court's information, Your

11   Honor, I was retained by the client and immediately hired a

12   pro hac vice lawyer to present me to this Court for approval

13   to practice law on this particular case in Florida.  So I

14   don't know what else is left to do.

15          THE COURT:  And did you file the original action or

16   you took over for somebody that had filed it?

17          MR. GRIMES:  No, Your Honor.  I substituted in on

18   the original action.

19          THE COURT:  Who was the original attorney?

20          MR. GRIMES:  Sleasman.  Forgive me for not

21   remembering his first name.

22          MS. SARMIENTO:  It's Peter Sleasman, Your Honor.

23          THE COURT:  It's what?

24          MS. SARMIENTO:  Peter Sleasman.

25          THE COURT:  Okay.

```
 1              So the case had already been filed?

 2              MR. GRIMES:  Yes.  The case was filed in 2014.  I

 3    substituted in a year later, in 2015.  And after

 4    substitution, we acquired the services of Ms. Newman.

 5              THE COURT:  The Court wouldn't allow you to

 6    substitute in unless you already had a local counsel.

 7    Shouldn't have, right?

 8              MR. MARRERO:  We agree.

 9              THE COURT:  Did you hire her before you filed a

10    motion to substitute counsel?

11              MR. GRIMES:  I would have to review the file for

12    that question, Your Honor.  I have not looked at that in some

13    time.

14              MR. PRICE:  Here's the problem you have when you go

15    back to this Chandris case.  And I certainly hear California

16    counsel trying to instruct us on Florida law, but this is

17    what the Florida Supreme Court eventually says.  When you

18    have an out-of-state non-licensed -- Florida non-licensed

19    attorney, it says this:  Such a Florida contingent fee

20    agreement for joint legal services in personal injury or tort

21    cases has to be in writing, must be executed by the client, a

22    Florida attorney and a non-Florida attorney, and must state

23    the division of fees to be applied.

24              The Florida Supreme Court has said that.  It's the

25    seminal case from the Florida Supreme Court.
```

1          And Mr. Grimes never did that.  Ms. Sarmiento

2     didn't do that.  And by their own admission as they stand

3     here today is they don't have a valid fee contract that's

4     required by the Florida Bar, which is required under Florida

5     law.  And the Chandris case makes that clear.  And that's why

6     these fees cannot leave the state of Florida and needs

7     further adjudication by this Court.

8          And, again, I would invite the Court, since I've

9     been challenged on what Chandris says, to allow this Court to

10    review Chandris.  And I think it's very straightforward as to

11    the requirements and the fact that Grimes and Sarmiento never

12    followed them.

13         THE COURT:  Do you have the original agreement?

14    Does somebody have the original agreement that Mr. Grimes and

15    the client entered into?

16         MR. PRICE:  I have an extra copy of all of them,

17    Your Honor, and I can present them to --

18         THE COURT:  What do you mean "all of them"?  How

19    can there be more than one?

20         MR. PRICE:  Well, apparently, there were different

21    individuals who had a stake through this.

22         THE COURT:  What does that mean?

23         MR. PRICE:  Well, one is with Andre Chapman.  The

24    other is Chineaqua Breelove.  Another one is Deborah Johnson.

25    Another one is Harold Marr.  Another one is Renee Chapman.

 1   Apparently -- I guess these were all family members who had

 2   some kind of stake in the outcome of the case, Your Honor.

 3           So I have all of their contracts right here in

 4   hand.  I'm more than happy to present those to the Court.

 5           THE COURT:  Let me see those.

 6           MR. PRICE:  Sure.

 7           THE COURT:  Let me take a 15-minute recess and

 8   we'll come back.

 9           (Recess taken from 10:06 until 10:20 a.m.)

10           THE COURT:  Okay.  So I have reviewed the

11   attorney-client agreement between Mr. Grimes' firm and Andre

12   Chapman and the other people.  They all seem to be identical

13   in language.

14           I also briefly reviewed the Chandris versus

15   Yanakakis case from the Florida Supreme Court, and that

16   certainly raises some serious questions in my mind about the

17   validity of the contract.

18           But I think the focus of your presentation to me

19   and writing has been on the issue of the charging lien.  And

20   I would like to have more written submissions concerning the

21   validity of the contract between Mr. Grimes' firm and what

22   implications that might have; but I also don't want to keep

23   other defendants in the case that they shouldn't still be in

24   the case and, more importantly, I want to get the estate its

25   money.

1          My suggestion is to give you all time to further

2     brief this issue, but in the meantime to have the settlement

3     funds distributed to the plaintiff in the case, and then any

4     attorney's fees, not just the ten percent, but all the

5     attorney's fees will be held in the trust account of Mr.

6     Sutton pending the resolution of this other issue.

7          So how do we accomplish that?

8          MR. SUTTON:  First of all, I accept that

9     responsibility.

10         THE COURT:  All right.  Thank you.

11         MR. SUTTON:  I will not disburse a penny until

12    there's either a written agreement from all parties, which I

13    would then present to this Court for approval for my own

14    protection.

15         Second, there are some sequence and time issues --

16    and timing issues.  I would like to depose Ms. Commons as to

17    the time sequence and what occurred, because I think it may

18    have some bearing on the applicability or inapplicability of

19    Chandris.  That's all I have to say.  I'm willing to accept

20    this in trust.

21         I may suggest -- and I have not checked this out.

22    Apparently, this is a Tampa probate, not a Miami-Dade County

23    probate, and there's a restricted depository.  And this is a

24    sizable sum of money.  I would suggest that this be in a

25    special separate escrow account, which, of course, I would

```
 1    identify rather than the typical IOTA trust account.

 2    Realizing the de minimis amount of interest you get these

 3    days, I would suggest something of that nature so that it is

 4    separate and distinct from IOTA trust account funds.

 5              THE COURT:  Do you mean the 1.2 million for

 6    attorney's fees?

 7              MR. SUTTON:  Well, I wasn't -- no.  I thought we

 8    were talking about the 4.5 million.

 9              THE COURT:  No.  I don't think anybody is taking a

10    contrary position that the plaintiffs themselves shouldn't

11    get their monies.

12              MR. SUTTON:  Good.  Good.

13              THE COURT:  So how do I accomplish that?

14              MR. SUTTON:  Which?

15              THE COURT:  Getting the plaintiffs their monies and

16    then putting -- but putting the 1.2 million attorney's fees

17    in your account.

18              MR. SUTTON:  Well, if it's so ordered, then we

19    could put the 4.5 million in my account and I would then

20    disburse to the designated plaintiffs by virtue of the order

21    of the probate judge, which is the way we've typically done

22    it.

23              THE COURT:  All right.

24              Yes.

25              MR. TOOMEY:  We need to know how to make out these
```

1  checks.

2            THE COURT:  I know that.

3            MR. TOOMEY:  That's our problem.

4            THE COURT:  Right.

5            MR. SUTTON:  That would be the Sutton Law Firm

6  Trust Account.

7            MR. TOOMEY:  I have $100,000 in this settlement.

8  The rest belongs to the state.  But these typically are made

9  out to the law firm and the estate or the personal

10  representative of the estate.

11            THE COURT:  Okay.

12            MR. TOOMEY:  I don't know what law firm that is.

13            THE COURT:  Okay.

14            MR. TOOMEY:  Because what I've heard here this

15  morning, there may not be a fee.

16            THE COURT:  Right.  That's why we're going to put

17  that into the trust account of Mr. Sutton.  We know he's a

18  Florida lawyer.  We know that he's going to comply with the

19  rules or my order.  So I'm not worried about that.

20            Just tell me what wording you want me to say in my

21  order and we'll do whatever it accomplishes.

22            MR. TOOMEY:  Going to Mr. Sutton's law firm

23  account, that's fine with us.

24            THE COURT:  Okay.

25            MR. TOOMEY:  Perfectly.  So just tell us how -- in

 1    your order, say we pay to Mr. Sutton's Trust Account.

 2              THE COURT:  Okay.

 3              MS. WEISSENBORN:  That would be the preference that

 4    we have, an order that says we have the check that is drawn

 5    to Mr. Sutton's Trust Account, which would be for the full

 6    amount of the settlement that the state defendants have to

 7    pay.

 8              MR. MARRERO:  But I think also on that check would

 9    be the estate, right?

10              MS. WEISSENBORN:  Right.

11              MR. MARRERO:  Yes.  It would be John Sutton Trust

12    Account and then the estate.  That would be how we would make

13    out the check.  I think we're all fine with that.

14              THE COURT:  Who signs on behalf of the estate?

15              MR. TOOMEY:  The personal representative, who will

16    have to sign the release as well.

17              THE COURT:  Okay.  Who is the --

18              MR. TOOMEY:  The leases haven't been signed.

19              MR. SUTTON:  The way I've done these is Sutton Law

20    Group Trust Account, so that I don't have a problem with the

21    bank.

22              And I will be exceptionally careful as to getting

23    an order or making sure this is approved.  And these

24    disbursements, I think it's going to give me trouble if it

25    says estate.  I'll put it in my -- I have a trust account.  I

think the Court knows I've been around a long time.  I'm not going anywhere.  And if we do it that way, I will then react and disburse to the, quote, "client" pursuant to court order.

MS. WEISSENBORN:  That would be probably preferable, to leave the estate out and just make it to Mr. Sutton's trust account, the full amount.

THE COURT:  I'm just looking at the style of the case and it has the estate and surviving relatives, Andre Chapman, Renee Chapman, Deborah Johnson, Chineaqua Breelove and Harold Marr.

MS. WEISSENBORN:  Most of those have been dismissed, Your Honor.

THE COURT:  Okay.

MS. WEISSENBORN:  There are only two and they are only survivors.  They only get to recover through the estate itself.

So if the total check goes to Mr. Sutton's trust account, at the point in time that there wants to be a distribution, that distribution, according to the court order that Ms. Stinson sent you, would have to be then disbursed and placed into the depository in Tampa at that bank, and then any disbursements to those survivors would then come out of an order of the probate court.

But to first disburse to them, it would have to go to Mr. Sutton, and Mr. Sutton would then have to get an order

1    from you allowing the disbursements to go to them.

2            MR. SUTTON:  If that's Ms. Weissenborn speaking, I

3    think the procedure she announced is correct.

4            THE COURT:  Okay.  So why don't you all submit -- I

5    mean, just submit an agreed order.  As far as I know, you're

6    not agreeing people shouldn't -- the lawyers shouldn't get

7    the money.  But an agreed order in terms of how for the time

8    being the funds should be paid to the estate, and 1.2 million

9    of that will be held in trust by Mr. Sutton until we resolve

10   the attorney's fees issues, and the rest shall be distributed

11   to the estate pursuant to the terms of the depository order.

12           So get that order to me in the next day or two, and

13   then that way, you are out of the issue.

14           So you want to take the deposition of Ms. Commons.

15   Is there any other discovery that anybody thinks needs to be

16   done before there's any legal submissions relating to the

17   issue of attorney's fees?

18           MR. SUTTON:  If we can just take a step back.  Is

19   it my understanding there would be one check for $4,500,000

20   payable to Sutton Law Group Trust Account?

21           MR. TOOMEY:  No, there will not.  There will be two

22   checks:  One for 4.4 million, my check for 100 grand.

23           MR. SUTTON:  Okay.

24           THE COURT:  Those are two different entities.

25           MR. SUTTON:  Okay.

1  THE COURT:  All right.  So do an agreed order with

2  that language.

3  So Mr. Sutton says he wants to depose Ms. Commons.

4  Is there any other discovery you want to do before

5  you submit any legal memorandum?

6  MR. SUTTON:  I just started looking at this case

7  two nights ago, which is also four days after having four

8  hours of surgery.  So I need to catch up on the facts.

9  And I don't want to waste time, but -- I don't want

10  to waste time, period.  But the only one I would think of at

11  this moment is Ms. Commons, but there may be more.  I need to

12  look at it more closely.

13  And I need a good mailing list.  Of course, come

14  off the portal, but there may be some that aren't on the

15  portal, such as Tampa probate counsel.

16  THE COURT:  Okay.

17  All right.  Any discovery you want to do?

18  MR. PRICE:  In terms of discovery, Your Honor, it

19  has now come out, I think, with all the pleadings, we've now

20  seen the contract, and by the admissions of Mr. Grimes and

21  Ms. Sarmiento, it now seems to be without dispute that their

22  contracts with the plaintiffs were signed just with the

23  plaintiffs and with Mr. Grimes and with no one else.

24  And given the nature of that, I know they want to

25  take the deposition of Ms. Commons.  I'm not too sure what

```
 1    the nature of that deposition would be or the scope of it.

 2    And what do we need to prove if in fact this is an invalid

 3    contract as a matter of law?

 4             THE COURT:  How would Ms. Commons have any

 5    information relating to -- first of all, let's assume these

 6    contracts -- let's see.  So this was June 17th or June 5th,

 7    2015.

 8             When was Ms. Commons' first involvement in the

 9    case?

10             MR. GRIMES:  August 2016, I believe, Your Honor.

11             THE COURT:  Is that right, roughly?

12             MS. COMMONS:  I started working the end of July,

13    the contract -- what I thought was the contract.

14             THE COURT:  2016?

15             MS. COMMONS:  Yes.

16             THE COURT:  So a year later?

17             MS. COMMONS:  Yes.

18             THE COURT:  Okay.

19             So why would you need to depose her about the

20    validity ab initio of the contracts, Mr. Sutton?  How would

21    her -- I mean, you may -- if these are valid contracts, then,

22    yes, you may need to depose her for the ultimate issue of

23    whether she's entitled to any fees.  But the first inquiry is

24    whether there's a valid contract where anybody is going to

25    get any fees.
```

1          MR. SUTTON:  First, it's a time sequence issue.

2          THE COURT:  Okay.

3          MR. SUTTON:  Second, if it goes to ten percent

4   versus quantum meruit, that would be a factual issue as to

5   what she did.

6          Third, if she was filing through the portal, and I

7   don't know what representations or what things occurred back

8   at that time period --

9          THE COURT:  Both your client and she say she didn't

10  get involved for a year later.  Whether it was August or

11  July, it's still a year later.

12         MR. SUTTON:  I understood your question.

13         As to the very beginning, beginning, before my

14  client was involved, I agree with Your Honor.

15         THE COURT:  Okay.

16         So I'm going to require then -- I guess since Ms.

17  Commons is the person who brought this issue up, so I'm going

18  to require that you file a pleading concerning the validity

19  or non-validity of the contingency fee agreements.  How much

20  time do you want to do that?

21         MR. PRICE:  I can do that within the next week,

22  Your Honor.

23         THE COURT:  Okay.  So how about by next Friday, the

24  23rd?

25         MR. PRICE:  That'll be fine, Your Honor.

1         THE COURT:  And how much time do you want to

2   respond?

3         MR. SUTTON:  May I have -- I don't know how

4   complicated it's going to be.  I'm going skiing next week.

5   May I have 30 days to respond, or 20?

6         THE COURT:  All right.  I'll give you until March

7   23rd, and then I'll give Ms. Commons another seven days if

8   they want to file a reply, March 30th.

9         So get me that agreed order so we can get all the

10  defendants out of the case and get the estate the money, and

11  then we'll resolve the attorney's fees at that schedule.  All

12  right.

13        MR. SUTTON:  We will be preparing that order.

14        THE COURT:  Thank you.

15        We'll be in recess.

16        (Proceedings concluded at 10:33 a.m.)

17              - - - - - - - -

18              Reporter's Certification

19  I certify that the foregoing is a correct transcript from the

20  record of proceedings in the above-entitled matter.

21                         s/Diane Peede, RMR, CRR, CRC
                           Official Court Reporter
22                         United States District Court
    Date:  February 19, 2018   Southern District of Florida
23

24

25